37139. MASSEY *v.* CITY OF MACON.

DECIDED MAY 21, 1958—
REHEARING DENIED JUNE 24, 1958.

*Frank G. Wilson,* for plaintiff in error.

*Durward B. Mercer,* contra.

FELTON, Chief Judge. Lawton Miller is Judge of the Recorder's Court of the City of Macon. He is also engaged in the private practice of law. Two cases for traffic violations against Jerry Duke Massey, the son of Ed C. Massey, Jr., regularly came before Judge Miller for trial. The defendant was found guilty in both cases in which fines were imposed, and paid. Also, as part of the sentence, the defendant's driver's license was suspended for sixty days and the license was forwarded by the Clerk of the Recorder's Court to the Department of Public Safety in Atlanta.

The actions of the contemner which allegedly constituted the contempt are set out in the judge's response filed in the certiorari proceeding and, since that response is not traversed, the recitals therein must be taken as true. The pertinent parts of the response are as follows: "On the afternoon of Friday, February 22, 1957, Ed C. Massey telephoned respondent at respondent's office at 515 Persons Building, in the City of Macon. This is the location of the offices of the law firm of Miller, Miller & Miller, of which respondent is a member. Mr. Massey asked respondent if respondent was busy and respondent informed him that he was very busy, which was a fact. Mr. Massey stated that he wanted to come to respondent's office that afternoon and talk with respondent. Respondent inquired of Mr. Massey as to what he wished to talk with respondent about, and Mr. Massey answered that he wanted to talk about his son's cases. Respondent advised Mr. Massey that respondent would prefer not to discuss the son's cases as they had been concluded except for suspension of the son's driver's license, which was still in effect. Mr. Massey insisted that he wanted to come to respondent's office that afternoon and talk about his son's cases. Respondent then endeavored to explain to Mr. Massey and get him to appreciate the fact that several thousand cases are made

monthly by the Macon Police Department, and respondent could not possibly discuss all of them in his law office, and that, if respondent made an exception in Mr. Massey's case, respondent could not thereafter decline to talk with all others who had or were interested in cases in Recorder's Court. Respondent informed Mr. Massey that he had, therefore, had to adopt and follow a policy of not discussing Recorder's Court cases anywhere except in the court. Mr. Massey was unwilling to accept this explanation and kept insisting that respondent talk with him about his son's cases in respondent's law office that afternoon. Respondent finally advised Mr. Massey that if he would contact respondent the next morning at the City Hall, either before or after the session of Recorder's Court, or on any other morning which might better suit Mr. Massey's convenience, respondent would discuss his son's cases with him. Mr. Massey then told respondent, 'You're going to talk with me today.' This conversation consumed perhaps 10 minutes, and respondent had extreme difficulty in getting Mr. Massey to stop talking long enough at any point for respondent to try to reason with him. Respondent finally advised Mr. Massey that if he was not willing to contact respondent at the City Hall, as requested, there was nothing to be accomplished by discussing the matter with him further, and at this juncture respondent discontinued the telephone conversation and hung up the telephone. At no point in the telephone conversation did respondent tell Mr. Massey to 'shut up.' His statement to this effect is false. Respondent did not at any time during the telephone conversation treat Mr. Massey with discourtesy or rudeness. Respondent endeavored, without success, to explain respondent's policy, concerning discussing cases, with him, and sought his respect of this policy. At no point in the telephone conversation did Mr. Massey advise respondent that his automobile liability insurance had been or was in any manner likely to be adversely affected by the suspension of his son's driver's license. . . About five minutes after termination of the telephone conversation, Mr. Massey appeared in the lobby of respondent's office in the Persons Building. . . Mr. Massey told respondent's said brother that he wanted to see respondent and was advised

to go on back to respondent's office. Mr. Massey came rushing into respondent's private office. Respondent could tell by his manner and the scowl on his face that he was in a highly emotional and upset state. He was mad to the fighting stage when he entered respondent's office. His first words were, before respondent said anything, 'You're going to apologize for hanging up in my face.' Respondent, without raising his voice, told Mr. Massey that he had nothing to apologize to him about and that if he would come to the City Hall, as respondent had requested, respondent would talk with him about his son's cases. Mr. Massey said, 'No, you're going to apologize for hanging up in my face.' He was trembling all over and was standing facing respondent, with his face sort of pushed forward toward respondent's face. Respondent, knowing that nothing could be accomplished except further difficulty while Mr. Massey was in such a mental state, placed his right hand lightly on his left shoulder and said to him, 'Ed, you and I have been friends for a long time. You're acting childish about this matter. Now, sit down and cool off. I can't talk with you until you do.' Respondent did not exert any pressure on him whatsoever. Respondent did not push or shove Mr. Massey into a chair or make any effort to do so. His assertion that respondent did so is absolutely false. Respondent was endeavoring to get Mr. Massey to calm down and prevent a physical fight in respondent's office. Instead of sitting down, as requested, he said, 'You can order me around at the City Hall, but you can't order me around anywhere else.' By this time his voice had become shrill and loud as his anger rose. Respondent said to him, 'Ed, I'm not trying to order you around. All I want you to do is sit down and get hold of yourself.' Respondent did not put his hand on Mr. Massey's shoulder again or make any attempt to do so. Mr. Massey replied that he came to respondent's office to make respondent apologize and that he was going to force respondent to do so.

"Respondent then told Mr. Massey that he had gone too far and that if he didn't get out of respondent's office, respondent would call the police and have him taken out. He then started walking out of respondent's private office through the office

lobby, toward the hallway in the building, looking back at respondent as he did so. Respondent walked to the door leading from his private office into the lobby and stopped in the doorway. When Mr. Massey got about half way from respondent's private office doorway to the entrance into the hall of the building, he stopped and turned back toward respondent and said, 'I dare you to come out into the hall. If you do, I'll give you a beating you'll never forget.' Respondent said to him, 'Ed, you're in enough trouble now. Get out of here before I call the police.' About this time Wallace Miller, Jr., came out of the law library and told Mr. Massey that he had better leave. As Mr. Massey started walking toward the door from said office into the hall of the building, respondent walked to the stenographer's desk located in the lobby some twenty feet from the doorway leading from said office into said hallway and picked up the telephone receiver and began dialing the City Hall. Mr. Massey then walked out of the lobby into the hall and stuck his head around the door jamb into respondent's offices and shouted to respondent, 'You've got to come out of this office some time. When you do, I'll be waiting for you. I'll get you. Don't forget that.' Then Mr. Massey left and respondent never did call the City Hall."

The only question presented for determination is whether the contemner's conduct and action amounted to contempt under Code §. 24-105. Since Judge Miller at the time was in his private law office and was not acting as a court, the question boils down to a finer point of whether the contemner was guilty of constructive or indirect criminal contempt. "Conduct outside the presence of a court does not constitute contempt of the court unless it amounts to an obstruction of the administration of justice by the court. . . The administration of justice consists in the trial of cases in the court, and their judicial determination and disposition by orderly procedure under rules of law, and putting the judgments into effect." *Townsend* v. *State of Georgia,* 54 *Ga. App.* 627, 632 (188 S. E. 560).

In the instant case while the contemner originally telephoned Judge Miller concerning his son's cases, the reason the contemner came to the judge's office was for the purpose of forcing the

judge to apologize for "hanging up in his face," a purely personal matter. Nowhere does it appear that the contemner came to the judge's office for the purpose of further discussing the cases or for any reason connected with court business. His presence there was for purely personal reasons and while he was there his whole conduct was motivated by his desire to secure an apology for what the contemner apparently considered a personal affront. We do not see how his conduct at this time in any way interfered with or obstructed the administration of justice in the Recorder's Court of the City of Macon. Further, the cases were no longer pending before the Recorder's Court and, so far as contempt is concerned, had been terminated. Even Judge Miller apparently considered the cases as having been finally disposed of as "respondent advised Mr. Massey that respondent would prefer not to discuss the son's cases as they had been concluded except for the suspension of the son's driver's license, which was still in effect." The fact that under the law the Department of Public Safety upon Judge Miller's recommendation was authorized to reinstate the son's driver's license before the expiration of the sixty-day suspension did not have the effect of rendering the cases still pending in the Recorder's Court. Any action that Judge Miller may have taken in recommending to the Department of Public Safety the reinstatement of the son's driver's license would have been a separate and independent matter disconnected from the original cases.

The contemner's conduct in the judge's office which formed the basis of the finding of contempt did not amount to interference with or obstruction of the administration of justice which would have constituted a constructive or indirect criminal contempt. See *Clark* v. *State of Georgia*, 90 *Ga. App.* 330 (83 S. E. 2d 45), and *Adams* v. *State of Georgia*, 89 *Ga. App.* 882 (81 S. E. 2d 507).

The court erred in dismissing the certiorari.

*Judgment reversed. Quillian and Nichols, JJ., concur.*

### ON MOTION FOR REHEARING.

The defendant in error contends that the certiorari was properly dismissed because the plaintiff in error did not set out the ordinance under which he was tried for contempt. The plaintiff

in error alleged in his petition that he was convicted under Section 5-103 of the Code of the City of Macon and Section 46 of the city's charter, and quoted therefrom. In his untraversed response the recorder denied that the plaintiff in error was tried under Section 5-103 of the city code but alleged that he was tried under Section 28-105 of that code. However, the recorder admitted that Section 46 of the Charter of the City of Macon is codified in the code of the city as Section 5-103 and that Section 46 of the charter was correctly quoted in the petition for certiorari. Attached to the response is a certified copy of Section 28-105 of the city code which code section also incorporates therein that portion of Section 46 of the city charter relating to contempts in the recorder's court. The only authority granted to the Recorder of the City of Macon regarding contempts is found in Section 46 of the city's charter (Ga. L. 1927, p. 1313) which states, "Said recorder shall not have the authority to inflict a greater punishment for contempts than to impose a fine of one hundred dollars or imprisonment, in the city prison for a time not exceeding thirty days." It is apparent that the authority to punish for contempts contained in Section 46 of the city's charter is incorporated in the city code in both sections 5-103 and 28-105. Since the power to punish for contempts contained in each of these code sections is derived from the same source in the city charter, it matters little whether the plaintiff in error was convicted under Section 5-103 or Section 28-105 of the city code. Since he could have been tried for contempt under each section of the code and since they are identical in so far as power to punish for contempt is concerned, the allegation and quotation from Section 5-103 in the petition for certiorari is sufficient to meet the requirements of law.