COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | |
| | § | No. 08-11-00285-CV |
| IN RE: PAULINE CHESSES and SUN CHESSES-SZABOS, | § | AN ORIGINAL PROCEEDING |
| Relators. | § | IN MANDAMUS |
| | § | |
| | § | |

# O P I N I O N

This is a discovery dispute amidst a will contest. Relators Pauline Chesses and Sun Chesses-Szabos filed a petition for writ of mandamus, arguing that Respondent, the Honorable Judge Eduardo Gamboa of Probate Court Number Two, clearly abused his discretion by: (1) refusing to order the disclosure of the Adult Protective Services (APS) file regarding Larry Chesses; and (2) refusing to allow the deposition of the APS case worker. Specifically, Relators contend that the trial court erred in finding that the disclosure of the APS records is not essential to the administration of justice. We conditionally grant the writ.

## FACTUAL SUMMARY

### The Early Years

In 1988, Larry Chesses executed a will which appointed Pauline Chesses, his daughter, as the executor of his estate. He left $30,000 to Sun Chesses-Szabos, his ex-wife, and the remainder of his estate to Pauline. Chesses had specifically told Pauline that if something happened to him, she should call an attorney by the name of William Collins. Over the years, Chesses and his daughter became estranged. At some point between 2004 and 2006, Pauline cut off all communication with her father at the recommendation of a therapist.

## The New Will

Chesses was admitted to Providence Memorial Hospital on July 9, 2010, for acute renal failure, altered mental state, and dehydration. The hospital forms inquired of religious affiliation. Chesses indicated both "Catholic" and "Jewish." On July 23, while hospitalized, Chesses executed a Last Will and Testament which left $10,000 to Pauline and nothing to Sun. The remainder of the estate was divided between the Chabad Lubavitch and B'Nai Zion congregations, the El Paso Jewish Community Foundation, and the El Paso Community Foundation. The will appointed Herbert Ehrlich as executor of the estate and his son, William Ehrlich, as the alternate executor. The estate was valued between $600,000 and $800,000. Hospital records of July 24 reveal that Chesses was depressed. On the 26th, one of his doctors noted:

> Fairly groomed in a hospital gown in a bed with decreased level of consciousness, . . . remains with avoidance of the eye contact. Thought process very slow. His speech is very slow as well, very concrete, somewhat disjointed, remains fairly confused and disoriented . . . Attention span and concentration fairly limited. Reality contact seems to be fairly fragile. Cognitive functions are overly disrupted. Insight and judgment is overly limited.

## Pauline's Story

A nurse named Maria called to tell Pauline of her father's hospitalization and on July 22, Pauline, her husband, and Sun arrived in El Paso from Virginia. The trio went straight to the hospital and learned that Chesses refused to eat and wanted to die. Dr. George Walker-Jackson advised Pauline that Chesses was not eating, was depressed, and had a growth on his liver. Pauline visited her father twice each day over the course of four days and returned to Virginia on July 25. Pauline began trying to reach her father by telephone approximately two weeks later and spoke with several nurses at different medical facilities, as her father had been moved from ICU to a private room, from there to a specialty hospital, then back to Providence and another

2

specialty hospital, and finally to hospice. One person, referred to in the record as Mary Ann, told Pauline that there were "suspicious people" around her father named Herbert Ehrlich and Brian Lee. Chesses passed away on September 4, although Pauline did not learn of his death until September 20.

Pauline received a telephone call on November 1 from America Devora, an Adult Protective Services Specialist. APS had been notified that Chesses was a "hoarder" and Devora was assigned to investigate. During this conversation, Devora asked Pauline whether she had been contacted by anyone.

> And I said, 'Well, I visited my dad in the hospital, and someone named Herbert Ehrlich called me and said that he was the executor.'
>
> And she said, 'Well, did he tell you that he left you anything?'
>
> And I said, 'No, he didn't tell me anything, but he told me that my dad was mad at me, and that he didn't even want me to know that he died, but he was a family man, and as a family man, I should know.'
>
> And what else did she say? She said -- oh. Oh, I was -- something like, 'I was worried about that. I'm concerned about this. I was very suspicious around the activities around your dad and about Herbert Ehrlich.'
>
> And I said, 'Herbert Ehrlich?' And I said, 'Well, that reminds me of a conversation in the hospital, when I was trying to find my dad, someone else had mentioned Herbert Ehrlich as being suspicious, and he was, I think, fighting with someone else as being power of attorney.'
>
> * * * *
>
> And she said my dad told her that Rabbi Greenberg pressured him to sign a will or -- or, no, to hire Herbert Ehrlich, and that he -- he or both pressured him to sign a will. He did not want to sign the will. . . . 'And he wanted everything to go to you. He said he loved you.'
>
> And I -- and I -- I started crying and I said, 'But Herbert Ehrlich told me he was angry at me.'
>
> And she said, 'No, that's not true. I cannot believe that. He said that he loved

3

you.' And then she said, 'And he -- he had regrets.'

And I said, 'He was not a good father.' And I go, 'Is that what he meant?'

Okay. And then she said, 'I don't know. I don't know.' She said, 'All he said was he had regrets, and he didn't want to sign this will and he -- he needed me to find you.'

Devora also told Pauline that she had tried to meet with Ehrlich or talk to him because she was just trying to do her job. According to Devora, Ehrlich refused to talk to her and would not return her telephone calls until after Chesses died. After this conversation, Relators contested the will, alleging Chesses lacked testamentary capacity and alleging Chesses was unduly influenced by Ehrlich. Relators also sought a declaratory judgment that the purported July 23, 2010 will was invalid. They claimed that Ehrlich intentionally interfered with their inheritance rights, and that the Ehlrich Law Firm is vicariously liable for Ehrlich's wrongful acts.

### Brian Lee's Story

Brian Lee met Chesses in 2001 and regularly played chess with him at the Westside library. Lee described Chesses as a non-practicing Jew who did not attend temple. When Lee learned Chesses was in the hospital, he began visiting him. Chesses told him that Rabbi Greenberg was pressuring him to sign documents that he did not want to sign. Chesses described himself as a "captive audience" because he could not get out of bed. During one of these visits, Chesses mentioned giving Lee a power of attorney. Chesses did not discuss his former wife or his daughter, other than to say they had come to visit and brought a plant for him.

### Ehrlich's Story

Rabbi Yisrael Greenberg of the Chabad Lubavitch congregation and Herbert Ehrlich are friends who meet nearly every Friday afternoon for Bible studies of the Old Testament. Ehrlich received a telephone call from the Rabbi on July 14. Rabbi Greenberg mentioned a person in

4

ICU who was asking to have a will written. One of Chesses' friends had contacted the Rabbi, albeit without a request from Chesses that he do so. Ehrlich felt some urgency that required him to go to the hospital. He met with Chesses in ICU and believed the man was not in a condition to discuss estate matters. He spoke with the Rabbi afterward and promised to go back. Rabbi Greenberg called Ehrlich again on July 19 to tell him Chesses was doing better. Ehrlich went to the ICU and asked to speak with the doctor. Dr. Erasto Cortes, an intensive care physician, appeared and Ehrlich inquired "how [Chesses] was doing, mentally." Dr. Cortes advised that Chesses was not yet ready "to discuss things that you're here for." Ehrlich asked for the doctor's telephone number and called him the next day. Reading from his notes, Ehrlich testified:

> Telephone conference with Dr. Cortes -- Erasto Cortes, intensive care doctor. Stated that Mr. Chesses is not capable of doing a power of attorney, nor is he capable of doing a will. . . . Mental capacity is improving, but as of this date he cannot --.

Ehrlich waited a few days and called Dr. Cortes again on July 22.

> And I said, I'm calling about Larry Chesses. How is his condition now? And he said, He's improved, and you can go down there and do what you have to do.

By mid-morning, Ehrlich was back at ICU. He began asking Chesses about his investments, bank accounts, furniture, and vehicles. Ehrlich then explained the conversation.

> So I said, Well, how do you want to leave your estate? He told me he had $800,000. And I said, How do you want to leave your estate? And then I asked him -- I said, Well, how much money -- how much do you want to leave to your daughter? Because I figured he would say, All of it. But then he told me, I'm estranged from my daughter. She doesn't talk to me. And all she wants and my ex-wife wants is my money. So I said, Well, you have to leave your daughter something. . . . And he told me, Okay, leave her a dollar.

Ehrlich described how he tried to encourage Chesses to leave more to Pauline by incremental increases, from $1, to $1,000, to $5,000, and finally to $10,000. As for the remainder of the estate, Ehrlich said,

5

> I'm telling him, if you don't do anything else, your daughter is going to get all of that money. . . . He said, No. He said, What can I do with the rest of my money? And that's when we started talking about charities.

When Chesses mentioned that he was Jewish, Ehrlich suggested Jewish institutions. The conversation turned to executors and Chesses told Ehrlich he wanted Brian Lee. Ehrlich asked about a successor executor and Chesses said there was no one he would trust with it. Then Chesses asked if Ehrlich would serve if Lee declined. Ehrlich did not know of the prior will, nor did he ask whether Chesses had one.

> He said he didn't remember. Well, if he didn't remember then I would have to send a letter or try to communicate with every lawyer in El Paso and anywhere else to get it. I didn't think that was what I was there for.

The meeting lasted about an hour, after which Ehrlich returned to his office and drafted the will. Ehrlich spoke with Lee later that evening and explained the duties and responsibilities of an executor.

> His response to me was very short. He said, I don't want to get mixed up with his family in that regard. I thanked him very much and hung up the phone.

Ehrlich edited the will, naming himself as executor and his son as successor. Brian Lee testified that he never spoke with Ehrlich. Ehrlich also drafted a medical power of attorney, a statutory power of attorney, and a living will. The next day, July 23, Ehrlich called the hospital and they gave him "the green light." "I wanted to get it executed as soon as possible, because he was improving and I thought it would be appropriate to do it." So Ehrlich and his assistant, Ruby Martinez, drove to the hospital around 2 p.m. He did not know the family was in town, and Chesses never told him. When the pair arrived at the hospital, Ehrlich asked at the nurses' station if health care providers on the floor could assist as witnesses. He was told that protocol no longer permitted it, but they could get two other witnesses from other areas of the hospital. The two witnesses eventually arrived and there is some indication that one of them did not speak

6

English. Ehrlich had brought his camera and set it up to videotape the execution of the will. He had never videotaped a will execution before, nor had he used the video function on this particular camera before. He admitted that he thought Chesses' daughter might be "dissatisfied."

Ehrlich asked Chesses three questions but the video feature inexplicably shut off. Ehrlich described the sequence:

Q: So if I understood, you asked Mr. Chesses, What is your name and address? And answered you, It's --

A: Larry Chesses, and then he said something, El Paso, Texas.

Q: 2010?

A: Yeah.

Q: And then you asked him, What is your address?

A: Right.

Q: And on the tape, I don't believe he answered. Would you agree with that?

A: He didn't answer clearly, yes.

Q: Are you saying that there's some answer?

A: Well, I thought there was some answer. But on that particular thing, there is no answer.

Q: Okay. And so --

A: On your version. And it may be the version. I'm not going to argue with it.

Q: Okay. And that gets back to my question --

A: Right.

Q: -- did he ever answer that question, What is your address?

A: I didn't ask it again.

Q: Okay. So whatever answer he did or didn't give is on the tape?

7

A: That is correct.

Q: All right. And then you -- did you reask that question?

A: I did not.

Q: What is your -- okay. And then you asked another question --

A: Yes.

Q: -- to the effect of -- it was a complicated question, so I'm not even going to try to --

A: You want to know the question I asked?

Q: Please.

A: Would you reconsider giving your daughter more than $10,000 at this time? Because I can cross out the amount and we can execute the will. Before I was able to finish that question, he reared up and said, No, as I previously stated. At that point, I believe that he understood that he was writing his will. He understood his natural heir. And he understood the assets that he was giving away to her. And then -- and so I made my determination at that point, an also when I started reading the will to him, that he had testimonial capacity.

Q: Did you -- after you asked that question --

A: Yes.

Q: -- the third question, did you testify that you then turned to Ruby and said, I've got that on tape?

A: Yes. After I asked the question and he raised up, I said, I got it on tape. But the tape -- I thought the tape was still going.

The tape was not still going. Ehrlich then asked whether Chesses was ready to go over the will and began reading it to him, although he did not read it verbatim.

Ehrlich admitted having a telephone conversation with America Devora on September 14, ten days after Chesses' death. He described her as aggressive and strenuously pursuing information relating to conversations Ehrlich had with her client. He refused to discuss the

8

matter: "[S]he was prying, and she was accusing me of doing, an accusatory manner that I did something wrong." They also discussed testamentary capacity:

> She told me that there's no way that he could do a will. And then I said, Are you a lawyer? And she said, No. I said -- I asked her then, Do you know what testamentary capacity is? Well, why would I have to know that she replied, or something to that effect. I said, Well, if you're not a lawyer and you don't understand testamentary capacity, I don't think this conversation's going anywhere. I didn't want to waste my time with her. I figured, number one, I didn't know why she wanted the information. The man was now dead. The man had been in the hospital. And she obviously didn't think much of me because she wouldn't be demanding this information from somebody she respected. So I told her. Let's terminate this conversation because it's not going anywhere. And I normally do that when I get this type of phone call. If you're not going to be informative and we're not going to be able to have a reasonable discussion -- and then I couldn't discuss anything with her because it was my client, and he had his privilege, so I terminated the phone call.

He also described a telephone conversation with Pauline in which he told her Chesses was dead and where he was buried. He denied telling her that Chesses was angry with her.

## THE ISSUE

In its simplest form, the question before this court is whether the APS file and the testimony of America Devora are essential to the administration of justice. We conclude that they are.

## <u>Standard of Review</u>

To be entitled to mandamus relief, Relators must meet two requirements. *In re Prudential Insurance Co. of America, L.L.C.*, 148 S.W.3d 124, 135 (Tex. 2004), *citing Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). First, they must show that the trial court clearly abused its discretion. *Prudential*, 148 S.W.3d at 135. Second, they must demonstrate that there is no adequate remedy by appeal. *Id.*; *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 462 (Tex. 2008)(orig.proceeding).

Traditionally, a writ of mandamus was available only to compel the performance of a

ministerial act or duty. *Walker*, 827 S.W.2d at 839. However, mandamus also lies where the trial court has clearly abused its discretion. *Id*. at 839-40. A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985).

In addition to the clear abuse of discretion requirement, mandamus will not issue where there is an adequate remedy at law, such as a normal appeal. *State v. Walker*, 679 S.W.2d 484, 485 (Tex. 1984). Mandamus is an extraordinary remedy, available only in limited circumstances; thus, the writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals*, 767 S.W.2d 680, 684 (Tex. 1989). The requirement that persons seeking mandamus relief establish the lack of an appellate remedy is a fundamental tenet of mandamus practice. *Id*. Nevertheless, "[u]sed selectively, mandamus can 'correct clear errors in exceptional cases and afford appropriate guidance to the law without the disruption and burden of interlocutory appeal." *In re Columbia Medical Center of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 207 (Tex. 2009)(orig.proceeding).

The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against its detriments. *Prudential*, 148 S.W.3d at 136. The reviewing court must consider whether mandamus relief will safeguard important substantive and procedural rights from impairment or loss. *Id*. We must consider whether mandamus will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *Id*.; *see In re GlobalSantaFe Corp.*, 275 S.W.3d 477, 483 (Tex. 2008)(orig.proceeding).

**The Statutes**

Chapter 48 of the Texas Human Resources Code relates to investigations and protective services for elderly and disabled persons. "The purpose of this chapter is to provide for the authority to investigate the abuse, neglect, or exploitation of an elderly or disabled person and to provide protective services to that person." TEX.HUM.RES.CODE ANN. § 48.001 (West 2001). Section 48.101 addresses confidentiality and disclosure of information.

> (a) The following information is confidential and not subject to disclosure . . . :
>
>> (1) a report of abuse, neglect, or exploitation made under this chapter;
>>
>> (2) the identity of the person making the report; and
>>
>> (3) except as provided by this section, all files, reports, records, communications, and working papers used or developed in an investigation made under this chapter or in providing services as a result of an investigation.

TEX.HUM.RES.CODE ANN. § 48.101(a)(West Pamph. 2011). There are, of course, exceptions allowing for disclosure of the otherwise confidential information under certain circumstances. *See id* at § 48.101(b)-(g-1). For example, Section 48.101(c) allows a trial court to order the disclosure of otherwise confidential information if:

> (1) a motion is filed with the court requesting release of the information and a hearing on that request;
>
> (2) notice of that hearing is served on the department or investigating state agency and each interested party; and
>
> (3) the court determines after the hearing and an in camera review of the information that disclosure is essential to the administration of justice and will not endanger the life or safety of any individual who:
>
>> (A) is the subject of a report of abuse, neglect, or exploitation;
>>
>> (B) makes a report of abuse, neglect, or exploitation; or
>>
>> (C) participates in an investigation of reported abuse, neglect, or

11

exploitation.

*Id.* at 48.101(c).[1]

Section 48.101(b) provides that:

> (b) Confidential information may be disclosed only for a purpose consistent with this chapter and as provided by department or investigating state agency rule and applicable federal law.

---

[1] The Code also provides that: (d) The executive commissioner shall adopt rules providing for the release, on request, to a person who is the subject of a report of abuse, neglect, or exploitation or to that person's legal representative of otherwise confidential information relating to that report. The department or investigating state agency shall edit the information before release to protect the confidentiality of information relating to the reporter's identity and to protect any other individual whose safety or welfare may be endangered by disclosure.

(d-1) Subject to Subsection (e-1), the executive commissioner shall adopt rules providing for the release, on request, by the department or investigating state agency of otherwise confidential information relating to a person who is the subject of a report or investigation of abuse, neglect, or exploitation or to whom the department has provided protective services, to:

> (1) a court that has a matter pending before it that involves the person;
>
> (2) the attorney ad litem or any other legal representative, other than a guardian, appointed for the person; and
>
> (3) the person's legal guardian.

(e) The executive commissioner may adopt rules relating to the release of information by the department or investigating state agency that is contained in the record of a deceased individual who was the subject of an investigation conducted by the department or investigating state agency or to whom the department has provided protective services. The rules must be consistent with the purposes of this chapter and any applicable state or federal law. The executive commissioner shall adopt rules, subject to Subsection (e-1), that provide for the release, on request, of otherwise confidential information in the deceased person's record to the personal representative appointed for the person's estate.

(e-1) Information released by the department or an investigating state agency under Subsection (d-1) or to a personal representative under Subsection (e) may not include the identity of the person who made the report of abuse, neglect, or exploitation.

(f) The department or investigating state agency may establish procedures to exchange with another state agency or governmental entity information that is necessary for the department, state agency, or entity to properly execute its respective duties and responsibilities to provide services to elderly or disabled persons under this chapter or other law. An exchange of information under this subsection does not affect whether the information is subject to disclosure under Chapter 552, Government Code.

(g) The department may establish procedures to exchange with a community service provider or local governmental entity confidential information relating to a report made under Section 48.051(a) that is necessary for the department, provider, or entity to provide protective services, health care services, housing services, or social services to the person who is the subject of the report. An exchange of information under this subsection does not affect whether the information is subject to disclosure under Chapter 552, Government Code.

(g-1) The executive commissioner by rule shall provide policies and procedures that are designed to guard against the unauthorized release or dissemination of confidential information that is exchanged under Subsection (g).

12

*Id.* at § 48.101(b).

## THE INVESTIGATION

We are presented with an initial report of self-neglect by hoarding and a later report of exploitation. We must thus decide whether an APS specialist may be compelled to produce files and offer testimony regarding the charges of exploitation. Subsection (e) requires the executive commissioner to adopt rules that provide for the release, on request, of otherwise confidential information in the deceased person's record to the personal representative appointed for the person's estate. Here that would be Ehrlich, the individual Devora believed to be guilty of exploitation. We also look to subsection (d-1), which allows the department to relinquish confidential information to a court that has a matter pending before it that involves the person. We then turn to subsection (c-3), which requires the trial court to determine after hearing and an *in camera* review whether disclosure is essential to the administration of justice. Judge Gamboa found it was not.

Although Judge Gamboa was bothered by the way Pauline received the information, we emphasize at the outset that whether Devora breached confidentiality is not material to our decision. Subchapter I of the Human Resources Code contains enforcement procedures encompassing both administrative and judicial review of employee misconduct. We thus reject Appellees' argument that any information gleaned from Devora would be "fruit of the poisonous tree."

Moreover, as required by the Human Resources Code, the Department of Family Protective Services has crafted rules related to the confidentiality and integrity of APS case records. An APS investigator should investigate. Investigation often requires a discussion with collateral witnesses, called "collaterals" in the APS handbook. Indeed section 5112.12 of the

13

handbook specifies that the APS specialist "may provide collaterals, including the reporter, with pertinent case information as needed in order to: (1) obtain information necessary for the investigation; or (2) arrange for services to address abuse, neglect, or exploitation." Thus, the sole question is whether disclosure of Devora's file and her testimony is essential to the administration of justice.

### WHAT IS "ESSENTIAL TO THE ADMINISTRATION OF JUSTICE"?

During oral argument, the real parties in interest focused heavily on the definition of "essential," comparing the term to "relevant" and arguing that "essential" required the evidence be more than merely relevant. We believe the focus should first be on the phrase "administration of justice" and then what is "essential" to that process.

The Human Resources Code does not define the administration of justice. The phrase has been bandied about frequently within our statutes, rules, and case law but it is ill-defined. We have discovered the following analysis:

> 'Administration of justice' has been described thusly: 'The administration of justice consists in the trial of cases in the court, and their judicial determination and disposition by orderly procedure, under rules of law, and putting of the judgment into effect.'

*Howell v. State,* 559 S.W.2d 432, 436 (Tex.Civ.App.--Tyler 1977, writ ref'd n.r.e.), *citing Massey v. City of Macon*, 97 Ga.App. 790, 794, 104 S.E.2d 518, 521-22 (1958). And the Texas Court of Criminal Appeals has described the administration of justice as the "daily application of the law to particular facts." *Matchett v. State*, 941 S.W.2d 922, 932 (Tex.Crim.App. 1996). We adopt these definitions.

"Essential" encompasses the concepts of necessity, importance, indispensable, crucial, and substantive. Real parties in interest contend, and Judge Gamboa agreed, that the information

14

is available elsewhere and in some instances would be cumulative. These arguments require a careful cross reference of the evidence which already appears in the record.

We know from Brian Lee that Chesses complained Rabbi Greenberg was pressuring him to sign documents that he did not want to sign. Chesses described himself as a "captive audience" because he could not get out of bed. Lee also described Chesses as a non-practicing Jew who did not attend temple.

From Herbert Ehrlich we know that Rabbi Greenberg, who did not know Chesses until contacted by a friend, had made his acquaintance at least by July 14, five days after he was admitted to ICU. When the Rabbi called Ehrlich on July 14 to discuss a person in ICU wanting a will, Ehrlich went immediately to the hospital and expressed he felt "some urgency" to go right away. We know that Rabbi Greenberg called Ehrlich again on July 19 to tell him Chesses was doing better and Ehrlich headed right back to ICU. He spoke with the intensive care physician and learned that Chesses was still not yet "ready." Ehrlich asked for the doctor's telephone number and called him the next day. The doctor told him Chesses' mental capacity was improving but he was still incapable.

Ehrlich waited two more days and when he heard Chesses had improved, he was back at ICU by mid-morning and discussed with Chesses his estate. On July 23, he was given the "green light" by the medical staff. He "wanted to get it executed as soon as possible, because he was improving." One might infer that Ehrlich wanted to get the will signed before the opportunity was lost. Ehrlich testified that Chesses wanted Brian Lee to be named as executor of the estate but that Lee declined. Lee said he never talked to Ehrlich. All of these discrepancies are available for use at trial without reference to the APS specialist.

Ehrlich attempted to videotape the execution of the will, the first time he had ever done so. The tape inexplicably shut off before Ehrlich asked the big question:

> Would you reconsider giving your daughter more than $10,000 at this time? Because I can cross out the amount and we can execute the will. Before I was able to finish that question, he reared up and said, No, as I previously stated. At that point, I believe that he understood that he was writing his will. He understood his natural heir.

Ehrlich denied telling Pauline that her father was angry with her. America Devora told Pauline a different story.

When Pauline described how Ehrlich told her Chesses was mad at her, Devora responded that she had been suspicious of Ehrlich. We know that a nurse named Mary Ann had made a similar statement. But Devora went a step further. Chesses told Devora that Rabbi Greenberg pressured him to hire Herbert Ehrlich, and that both gentlemen pressured him to sign a will that he did not want to sign. Chesses "wanted everything to go to you. He said he loved you." Devora also refuted Ehrlich's statements to Pauline. She couldn't believe that Ehrlich told Pauline that Chesses was angry. "He said that he loved you . . . he didn't want to sign this will and he -- he needed me to find you." This he-said/she-said scenario is a battle of words. There is one person who can corroborate what really transpired. Ehrlich tried to prove that Chesses was estranged from his daughter and wanted to leave her as little as possible. He videotaped the execution, even told his assistant that "he had it on tape." But of course, it is not on tape. As executor, Ehrlich has the authority to review the APS files. Without court intervention, Pauline does not.

We have reviewed the sealed files. Without detailing the specific contents, we know Devora saw Chesses on the day he executed the will. Her observations are recorded. Devora, suspicious of the swirling attention around Chesses, was concerned about the exploitation of her

client. Her attempts to investigate an ongoing APS case were complicated by Ehrlich's failure to cooperate. Her call to Pauline was part of that investigation. That this phone conversation happened in the way that Pauline described it can only be corroborated through Devora's testimony and her investigative file. Pauline's testimony is inadmissible unless her recitation of Devora's statements is corroborated. *See* TEX.R.EVID. 601(b).

## AVAILABILITY OF MANDAMUS REVIEW

There are few cases addressing the issue before us, five to be exact. We will examine each in turn in chronological order.

In *Coachman v. State*, 692 S.W.2d 940 (Tex.App.--Houston [1st Dist.] 1985, pet. ref'd), the defendant was convicted of aggravated sexual assault of a child. On direct appeal, he challenged the trial court's refusal to permit his attorney to review the entire file from Children's Protective Services. Coachman contended that he was entitled to discover the name of the person who filed the report and he was thus thwarted in his attempt to find potential witnesses. The trial court required the prosecution to identify all of the State's witnesses to be called at trial. The defense was also able to elicit testimony revealing the name of the reporter. Because Coachman made no showing of prejudice or necessity, the appellate court concluded that the confidential nature of child abuse reports should be maintained.

In *James v. State*, 47 S.W.3d 710 (Tex.App.--Texarkana 2001, no pet.), the defendant was charged with the aggravated sexual assault of his daughter. He complained on direct appeal that the trial court erroneously excluded records of the Texas Department of Protective and Regulatory Services which possibly contained evidence of prior false accusations made by the victim. The trial court reviewed the documents *in camera* and denied James' request for release of the records. The court of appeals found no error because in reviewing the sealed file, it found

17

no record that would have been useful to the defense, nor did it show that any prior allegations were determined to be false. *Id.* at 712.

*In re Fulgium*, 150 S.W.3d 252 (Tex.App.--Texarkana 2004, no pet.)(orig. proceeding) addressed the discoverability of confidential records in a suit affecting the parent-child relationship. The Fulgiums sought mandamus relief to compel discovery of CASA records and the depositions of the CASA case manager and the custodian of records of the Texarkana Children's Advocacy Center. CASA and the Advocacy Center sought protective orders, alleging that the records were privileged under the Texas Family Code. TEX.FAM.CODE ANN. § 261.201 (West 2008). The appellate court denied mandamus relief because the Fulgiums failed to show that the information was essential to the administration of justice or that the disclosure posed no danger to child or another person. *Id.* at 255. In short, the grandparents had not demonstrated that the trial court clearly abused its discretion.

In *S.C.S. and K.J.S. v. Texas Department of Family and Protective Services*, 2010 WL 2889664 (Tex.App.--Fort Worth 2010, no pet.), the appellants appealed from the denial of their motions for disclosure of CPS records pursuant to the Texas Public Information Act. CPS objected to releasing the information. The trial court conducted an *in camera* review and found that disclosure was not essential to the administration of justice. The appellants claimed that disclosure was essential to determine if civil or criminal actions should be pursued against the person who filed false reports. Reports of sexual abuse and negligent supervision were made in both Texas and Oklahoma. Both investigations were "ruled out." The appellate court, finding no case law or statutory provision suggesting that dismissed or "ruled out" complaints of child abuse are automatically deemed false and without merit, perceived no abuse of discretion. *Id.* at *2-3.

18

Finally, in *In re Agers*, 2010 WL 1780133 (Tex.App.--Texarkana 2010, orig. proceeding), a mother brought suit against a medical provider for negligence causing severe brain injury to her son, Cole. The hospital sought the production of all records regarding the child from the Department of Family and Protective Services. Agers opposed production of the records because they were confidential and irrelevant. Following an *in camera* review, the trial court ordered production and Agers sought mandamus review. The appellate court denied relief.

> In light of the parties' relative positions, Cole's condition, its cause(s), and any factors contributing thereto go to the very heart of this case. The Texas Supreme Court noted in *Walker* that a denial of discovery going to the heart of a party's case may render an appellate remedy inadequate. 827 S.W.2d at 843. Having reviewed the briefs, the record, and the DFPS records in dispute, we find that the trial court could have reasonably determined that the disclosure of the DFPS records is relevant to Cole's condition, pre-natal and/or post-natal care, and that their disclosure was essential to the administration of justice.

2010 WL 1780133 at *3.

We end with the story of Don Gray. *See Gray v. State*, 55 Tex.Crim. 90, 114 S.W. 635 (Tex.Crim.App. 1908). Gray shot and killed Will Phillips on January 12, 1907. The men were close friends and Phillips had been staying at Gray's home. When Gray's wife told him that Phillips had offered her a "gross and serious insult," an indecent proposal as it were, Gray drove into town and confronted Phillips. Several witnesses observed the two engaged in conversation and Phillips had a knife in his hand because he was whittling. The men moved out of sight and witnesses heard three shots fired in rapid succession. The prosecutor and the victim's family, who was pursuing civil litigation, took the position that Gray shot Phillips in the back. Gray claimed that as the men argued, Phillips started toward him with a knife and he fired in self-defense. The State claimed that the bullet entered the back and exited the breast. Gray claimed the bullet entered the breast and exited the back. There was no autopsy performed and no examination was conducted except as in the general course of preparing the body for burial.

19

Two trials in Llano County resulted in hung juries and venue was moved to Burnet County. Gray filed a motion to exhume the body so that the precise nature of the wounds could be carefully examined. The State objected that several witnesses had observed the wounds, but admitted that there was no eyewitness to the firing of the first shot or to the positions in which parties squared off. The court noted,

> It may be conceded that there was a strong showing made by the state that all three of the shots entered the body of the deceased from behind, and, yet, based not only on the testimony of appellant but the testimony of other witnesses, this fact is seriously disputed, and left, as we believe, in great doubt.

114 S.W. at 640. The primary issue before the court was its authority to order exhumation of Phillips' body. More than one hundred years have passed since the court wrote these words, but they express better than any others the true meaning of the "administration of justice":

> There may be no authority directly supporting our conclusion, and indeed we have found none, *but the conclusion at which we have arrived seems to be within itself so just, so necessary to the administration of justice, so valuable to society and the state, and so in keeping with the principles of justice, that it must be correct.* Such an examination would have ascertained the truth, and this is the supreme end for which rules of evidence were designed and towards which they should ever tend, so that we may in all reverence say that we are 'persuaded that neither death nor life' shall separate us from the ascertainment, when in the power of the court to do so, of the very truth in every case. Magna est veritas et prevalebit. (Truth is mighty and will prevail).

*Id.* at 643. [Emphasis and translation added.]

20

## CONCLUSION

Because the sealed files contain information essential to the administration of justice, we conclude that the trial court abused its discretion in refusing the discovery requests. This is precisely the type of situation involving manifest and urgent necessity. *Holloway v. Fifth Court of Appeals*, 767 S.W.2d 680, 684 (Tex. 1989). It is also a situation that cannot be remedied by direct appeal. *Agers*, 2010 WL 1780133 at *3. We conditionally grant the writ. Mandamus will issue only if Judge Gamboa fails to enter orders permitting discovery related to Devora and the APS files, excluding the name and identity of the reporter.

May 30, 2012

_____
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Antcliff, J., and Chew, C.J. (Senior)
Chew, C.J. (Senior), sitting by assignment