COURT OF
APPEALS

                                                   EIGHTH DISTRICT OF
TEXAS

                                                              EL
PASO, TEXAS

 


 
 
  
  
  
  
 IN RE:  PAULINE
 CHESSES and
 SUN CHESSES-SZABOS,
  
                                               
 Relators.
  
  
 
 
  
 '
    
 '
    
 '
    
 '
    
 '
  
 '
  
 
 
  
  
  
                   No. 08-11-00285-CV
  
 AN ORIGINAL PROCEEDING
  
 IN MANDAMUS
  
 
 


                                                                  O
P I N I O N

 

            This is a discovery dispute amidst a
will contest.  Relators Pauline Chesses
and Sun Chesses-Szabos filed a petition for writ of mandamus, arguing that Respondent,
the Honorable Judge Eduardo Gamboa of Probate Court Number Two, clearly abused
his discretion by: (1) refusing to order the disclosure of the Adult Protective
Services (APS) file regarding Larry Chesses; and (2) refusing to allow the deposition
of the APS case worker.  Specifically, Relators
contend that the trial court erred in finding that the disclosure of the APS
records is not essential to the administration of justice.  We conditionally grant the writ.  

FACTUAL SUMMARY

The Early Years

            In 1988, Larry Chesses executed a
will which appointed Pauline Chesses, his daughter, as the executor of his
estate.  He left $30,000 to Sun
Chesses-Szabos, his ex-wife, and the remainder of his estate to Pauline.  Chesses had specifically told Pauline that if
something happened to him, she should call an attorney by the name of William
Collins.  Over the years, Chesses and his
daughter became estranged.  At some point
between 2004 and 2006, Pauline cut off all communication with her father at the
recommendation of a therapist.

The New Will

Chesses
was admitted to Providence Memorial Hospital on July 9, 2010, for acute renal
failure, altered mental state, and dehydration. 
The hospital forms inquired of religious affiliation.  Chesses indicated both “Catholic” and “Jewish.”  On July 23, while hospitalized, Chesses
executed a Last Will and Testament which left $10,000 to Pauline and nothing to
Sun.  The remainder of the estate was
divided between the Chabad Lubavitch and B’Nai Zion congregations, the El Paso
Jewish Community Foundation, and the El Paso Community Foundation.  The will appointed Herbert Ehrlich as
executor of the estate and his son, William Ehrlich, as the alternate
executor.  The estate was valued between
$600,000 and $800,000.  Hospital records
of July 24 reveal that Chesses was depressed. 
On the 26th, one of his doctors noted:

Fairly groomed in a
hospital gown in a bed with decreased level of consciousness, . . . remains
with avoidance of the eye contact. 
Thought process very slow.  His
speech is very slow as well, very concrete, somewhat disjointed, remains fairly
confused and disoriented . . . Attention span and concentration fairly
limited.  Reality contact seems to be
fairly fragile.  Cognitive functions are
overly disrupted.  Insight and judgment
is overly limited.

 

Pauline’s Story

A
nurse named Maria called to tell Pauline of her father’s hospitalization and on
July 22, Pauline, her husband, and Sun arrived in El Paso from Virginia.  The trio went straight to the hospital and
learned that Chesses refused to eat and wanted to die.  Dr. George Walker-Jackson advised Pauline
that Chesses was not eating, was depressed, and had a growth on his liver.  Pauline visited her father twice each day
over the course of four days and returned to Virginia on July 25.  Pauline began trying to reach her father by
telephone approximately two weeks later and spoke with several nurses at
different medical facilities, as her father had been moved from ICU to a private
room, from there to a specialty hospital, then back to Providence and another
specialty hospital, and finally to hospice. 
One person, referred to in the record as Mary Ann, told Pauline that
there were “suspicious people” around her father named Herbert Ehrlich and
Brian Lee.  Chesses passed away on
September 4, although Pauline did not learn of his death until September 20.  

Pauline
received a telephone call on November 1 from America Devora, an Adult
Protective Services Specialist.  APS had
been notified that Chesses was a “hoarder” and Devora was assigned to
investigate.  During this conversation,
Devora asked Pauline whether she had been contacted by anyone.

And I said, ‘Well, I
visited my dad in the hospital, and someone named Herbert Ehrlich called me and
said that he was the executor.’

 

And she said, ‘Well, did he tell you that he left you anything?’

 

And I said, ‘No, he
didn’t tell me anything, but he told me that my dad was mad at me, and that he
didn’t even want me to know that he died, but he was a family man, and as a
family man, I should know.’

 

And what else did
she say?  She said -- oh.  Oh, I was -- something like, ‘I was worried
about that.  I’m concerned about
this.  I was very suspicious around the
activities around your dad and about Herbert Ehrlich.’

 

And I said, ‘Herbert
Ehrlich?’  And I said, ‘Well, that
reminds me of a conversation in the hospital, when I was trying to find my dad,
someone else had mentioned Herbert Ehrlich as being suspicious, and he was, I
think, fighting with someone else as being power of attorney.’

 

* *
* *

 

And she said my dad
told her that Rabbi Greenberg pressured him to sign a will or -- or, no, to
hire Herbert Ehrlich, and that he -- he or both pressured him to sign a
will.  He did not want to sign the will.  . . .  ‘And
he wanted everything to go to you.  He
said he loved you.’

 

And I -- and I -- I
started crying and I said, ‘But Herbert Ehrlich told me he was angry at me.’

 

And she said, ‘No,
that’s not true.  I cannot believe
that.  He said that he loved you.’  And then she said, ‘And he -- he had regrets.’

 

And I said, ‘He was not a good father.’ 
And I go, ‘Is that what he meant?’

 

Okay.  And then she said, ‘I don’t know.  I don’t know.’  She said, ‘All he said was he had regrets,
and he didn’t want to sign this will and he -- he needed me to find you.’

 

Devora also told
Pauline that she had tried to meet with Ehrlich or talk to him because she was
just trying to do her job.  According to
Devora, Ehrlich refused to talk to her and would not return her telephone calls
until after Chesses died.  After this
conversation, Relators contested the will, alleging Chesses lacked testamentary
capacity and alleging Chesses was unduly influenced by Ehrlich.  Relators also sought a declaratory judgment
that the purported July 23, 2010 will was invalid.  They claimed that Ehrlich intentionally
interfered with their inheritance rights, and that the Ehlrich Law Firm is
vicariously liable for Ehrlich’s wrongful acts. 


Brian Lee’s Story

Brian
Lee met Chesses in 2001 and regularly played chess with him at the Westside
library.  Lee described Chesses as a
non-practicing Jew who did not attend temple. 
When Lee learned Chesses was in the hospital, he began visiting
him.  Chesses told him that Rabbi
Greenberg was pressuring him to sign documents that he did not want to
sign.  Chesses described himself as a “captive
audience” because he could not get out of bed. 
During one of these visits, Chesses mentioned giving Lee a power of
attorney.  Chesses did not discuss his
former wife or his daughter, other than to say they had come to visit and
brought a plant for him.  

Ehrlich’s Story

            Rabbi Yisrael Greenberg of the Chabad
Lubavitch congregation and Herbert Ehrlich are friends who meet nearly every
Friday afternoon for Bible studies of the Old Testament.  Ehrlich received a telephone call from the
Rabbi on July 14.  Rabbi Greenberg
mentioned a person in ICU who was asking to have a will written.  One of Chesses’ friends had contacted the
Rabbi, albeit without a request from Chesses that he do so.  Ehrlich felt some urgency that required him
to go to the hospital.  He met with
Chesses in ICU and believed the man was not in a condition to discuss estate
matters.  He spoke with the Rabbi
afterward and promised to go back.  Rabbi
Greenberg called Ehrlich again on July 19 to tell him Chesses was doing better.  Ehrlich went to the ICU and asked to speak
with the doctor.  Dr. Erasto Cortes, an
intensive care physician, appeared and Ehrlich inquired “how [Chesses] was
doing, mentally.”  Dr. Cortes advised
that Chesses was not yet ready “to discuss things that you’re here for.”  Ehrlich asked for the doctor’s telephone
number and called him the next day. 
Reading from his notes, Ehrlich testified:

Telephone
conference with Dr. Cortes -- Erasto Cortes, intensive care doctor.  Stated that Mr. Chesses is not capable of
doing a power of attorney, nor is he capable of doing a will.  . . .  Mental
capacity is improving, but as of this date he cannot --.

 

Ehrlich
waited a few days and called Dr. Cortes again on July 22. 

And I said, I’m
calling about Larry Chesses.  How is his
condition now?  And he said, He’s
improved, and you can go down there and do what you have to do.  

 

By
mid-morning, Ehrlich was back at ICU.  He
began asking Chesses about his investments, bank accounts, furniture, and
vehicles.  Ehrlich then explained the
conversation.

So I said, Well,
how do you want to leave your estate?  He
told me he had $800,000.  And I said, How
do you want to leave your estate?  And
then I asked him -- I said, Well, how much money -- how much do you want to
leave to your daughter?  Because I
figured he would say, All of it.  But
then he told me, I’m estranged from my daughter.  She doesn’t talk to me.  And all she wants and my ex-wife wants is my
money.  So I said, Well, you have to
leave your daughter something.  . .
.  And he told me, Okay, leave her a
dollar.

 

Ehrlich
described how he tried to encourage Chesses to leave more to Pauline by
incremental increases, from $1, to $1,000, to $5,000, and finally to
$10,000.  As for the remainder of the
estate, Ehrlich said, 

I’m telling him,
if you don’t do anything else, your daughter is going to get all of that money.  . . .  He
said, No.  He said, What can I do with
the rest of my money?  And that’s when we
started talking about charities. 

 

When Chesses
mentioned that he was Jewish, Ehrlich suggested Jewish institutions.  The conversation turned to executors and
Chesses told Ehrlich he wanted Brian Lee. 
Ehrlich asked about a successor executor and Chesses said there was no
one he would trust with it.  Then Chesses
asked if Ehrlich would serve if Lee declined. 
Ehrlich did not know of the prior will, nor did he ask whether Chesses
had one.  

He said he didn’t
remember.  Well, if he didn’t remember
then I would have to send a letter or try to communicate with every lawyer in
El Paso and anywhere else to get it.  I
didn’t think that was what I was there for.

            

The meeting
lasted about an hour, after which Ehrlich returned to his office and drafted
the will.  Ehrlich spoke with Lee later
that evening and explained the duties and responsibilities of an executor.  

His response to
me was very short.  He said, I don’t want
to get mixed up with his family in that regard. 
I thanked him very much and hung up the phone.

 

Ehrlich edited
the will, naming himself as executor and his son as successor.  Brian Lee testified that he never spoke with
Ehrlich.  Ehrlich also drafted a medical
power of attorney, a statutory power of attorney, and a living will.              The
next day, July 23, Ehrlich called the hospital and they gave him “the green
light.”  “I wanted to get it executed as
soon as possible, because he was improving and I thought it would be
appropriate to do it.”  So Ehrlich and
his assistant, Ruby Martinez, drove to the hospital around 2 p.m.  He did not know the family was in town, and
Chesses never told him.  When the pair
arrived at the hospital, Ehrlich asked at the nurses’ station if health care
providers on the floor could assist as witnesses.  He was told that protocol no longer permitted
it, but they could get two other witnesses from other areas of the
hospital.  The two witnesses eventually
arrived and there is some indication that one of them did not speak
English.  Ehrlich had brought his camera
and set it up to videotape the execution of the will.  He had never videotaped a will execution
before, nor had he used the video function on this particular camera before.  He admitted that he thought Chesses’ daughter
might be “dissatisfied.”            Ehrlich asked Chesses three questions
but the video feature inexplicably shut off. 
Ehrlich described the sequence:

Q: So if I
understood, you asked Mr. Chesses, What is your name and address?  And answered you, It’s --

 

            A: Larry Chesses, and
then he said something, El Paso, Texas.

            Q: 2010?

            A:  Yeah.

            Q: And then you asked
him, What is your address?

            A: Right.

            Q: And on the tape, I
don’t believe he answered.  Would you
agree with that?

            A: He didn’t answer
clearly, yes.

            Q: Are you saying that
there’s some answer?

A: Well, I
thought there was some answer.  But on
that particular thing, there is no answer.

 

            Q: Okay.  And so --

            A:  On your version.  And it may be the version.  I’m not going to argue with it.

            Q: Okay.  And that gets back to my question --

            A: Right.

            Q: -- did he ever answer
that question, What is your address?

            A:  I didn’t ask it again.

            Q: Okay.  So whatever answer he did or didn’t give is
on the tape?

            A: That is correct.

            Q: All right.  And then you -- did you reask that question?

            A: I did not.

            Q: What is your --
okay.  And then you asked another
question --

            A: Yes.

Q: -- to the
effect of -- it was a complicated question, so I’m not even going to try to --

 

            A:  You want to know the question I asked?

            Q: Please.

A:  Would you reconsider giving your daughter
more than $10,000 at this time?  Because
I can cross out the amount and we can execute the will.  Before I was able to finish that question, he
reared up and said, No, as I previously stated. 
At that point, I believe that he understood that he was writing his
will.  He understood his natural heir.  And he understood the assets that he was
giving away to her.  And then -- and so I
made my determination at that point, an also when I started reading the will to
him, that he had testimonial capacity.

 

Q:  Did you -- after you asked that question --

 

            A: Yes.

            

Q: -- the third
question, did you testify that you then turned to Ruby and said, I’ve got that
on tape?

 

A: Yes. After I
asked the question and he raised up, I said, I got it on tape.  But the tape -- I thought the tape was still
going.  

 

The tape was
not still going.  Ehrlich then asked
whether Chesses was ready to go over the will and began reading it to him,
although he did not read it verbatim. 

            Ehrlich admitted having a telephone conversation
with America Devora on September 14, ten days after Chesses’ death.  He described her as aggressive and
strenuously pursuing information relating to conversations Ehrlich had with her
client.  He refused to discuss the
matter:  “[S]he was prying, and she was
accusing me of doing, an accusatory manner that I did something wrong.”  They also discussed testamentary capacity:

She told me that
there’s no way that he could do a will. 
And then I said, Are you a lawyer? 
And she said, No.  I said -- I asked
her then, Do you know what testamentary capacity is?  Well, why would I have to know that she
replied, or something to that effect.  I
said, Well, if you’re not a lawyer and you don’t understand testamentary
capacity, I don’t think this conversation’s going anywhere.  I didn’t want to waste my time with her.  I figured, number one, I didn’t know why she
wanted the information.  The man was now
dead.  The man had been in the
hospital.  And she obviously didn’t think
much of me because she wouldn’t be demanding this information from somebody she
respected.  So I told her.  Let’s terminate this conversation because it’s
not going anywhere.  And I normally do
that when I get this type of phone call. 
If you’re not going to be informative and we’re not going to be able to
have a reasonable discussion -- and then I couldn’t discuss anything with her
because it was my client, and he had his privilege, so I terminated the phone
call.

 

He also
described a telephone conversation with Pauline in which he told her Chesses
was dead and where he was buried.  He
denied telling her that Chesses was angry with her.  

THE ISSUE

In
its simplest form, the question before this court is whether the APS file and
the testimony of America Devora are essential to the administration of
justice.  We conclude that they are. 

Standard of Review

            To be entitled to mandamus relief, Relators
must meet two requirements.  In re Prudential Insurance Co. of America,
L.L.C., 148 S.W.3d 124, 135 (Tex. 2004), citing Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992).   First,
they must show that the trial court clearly abused its discretion.  Prudential,
148 S.W.3d at 135.  Second, they must demonstrate
that there is no adequate remedy by appeal.  Id.;
In re McAllen Med. Ctr., Inc., 275
S.W.3d 458, 462 (Tex. 2008)(orig.proceeding).  

            Traditionally, a writ of mandamus
was available only to compel the performance of a ministerial act or duty.  Walker,
827 S.W.2d at 839.  However, mandamus
also lies where the trial court has clearly abused its discretion.  Id. at
839-40.  A trial court clearly abuses its
discretion if “it reaches a decision so arbitrary and unreasonable as to amount
to a clear and prejudicial error of law.”  Johnson
v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985).

            In addition to the clear abuse of
discretion requirement, mandamus will not issue where there is an adequate
remedy at law, such as a normal appeal.  State v. Walker, 679 S.W.2d 484, 485
(Tex. 1984).  Mandamus is an
extraordinary remedy, available only in limited circumstances; thus, the writ
will issue “only in situations involving manifest and urgent necessity and not
for grievances that may be addressed by other remedies.”  Holloway
v. Fifth Court of Appeals, 767 S.W.2d 680, 684 (Tex. 1989).  The requirement that persons seeking mandamus
relief establish the lack of an appellate remedy is a fundamental tenet of
mandamus practice.  Id.  Nevertheless, “[u]sed
selectively, mandamus can ‘correct clear errors in exceptional cases and afford
appropriate guidance to the law without the disruption and burden of
interlocutory appeal.”  In re Columbia Medical Center of Las
Colinas, Subsidiary, L.P., 290 S.W.3d 204, 207 (Tex. 2009)(orig.proceeding).

            The adequacy of an appellate remedy
must be determined by balancing the benefits of mandamus review against its
detriments.  Prudential, 148 S.W.3d at 136.  The reviewing court must consider whether
mandamus relief will safeguard important substantive and procedural rights from
impairment or loss.  Id.  We must consider whether
mandamus will “allow the appellate courts to give needed and helpful direction
to the law that would otherwise prove elusive in appeals from final judgments.”
 Id.;
see In re GlobalSantaFe Corp., 275
S.W.3d 477, 483 (Tex. 2008)(orig.proceeding).

The Statutes

            Chapter 48 of the Texas Human
Resources Code relates to investigations and protective services for elderly
and disabled persons.  “The purpose of
this chapter is to provide for the authority to investigate the abuse, neglect,
or exploitation of an elderly or disabled person and to provide protective
services to that person.”  Tex.Hum.Res.Code Ann. §
48.001 (West 2001).  Section
48.101 addresses confidentiality and disclosure of information.  

            (a) The
following information is confidential and not subject to disclosure . . . : 

(1)
a report of abuse, neglect, or exploitation made under this chapter;

 

(2)
the identity of the person making the report; and

 

(3) except as
provided by this section, all files, reports, records, communications, and
working papers used or developed in an investigation made under this chapter or
in providing services as a result of an investigation.

 

Tex.Hum.Res.Code Ann. §
48.101(a)(West Pamph. 2011).  There are,
of course, exceptions allowing for disclosure of the otherwise confidential
information under certain circumstances. 
See id at § 48.101(b)-(g-1).  For example, Section 48.101(c) allows a trial
court to order the disclosure of otherwise confidential information if:  

(1)   a
motion is filed with the court requesting release of the information and a
hearing on that request;

 

(2)   notice
of that hearing is served on the department or investigating state agency and
each interested party; and

 

(3)   the
court determines after the hearing and an in camera review of the information
that disclosure is essential to the administration of justice and will not
endanger the life or safety of any individual who:

 

(A) is the subject
of a report of abuse, neglect, or exploitation;

 

(B) makes a report
of abuse, neglect, or exploitation; or

 

(C) participates in
an investigation of reported abuse, neglect, or exploitation.

 

Id. at 48.101(c).[1]

Section
48.101(b) provides that:  

(b) Confidential
information may be disclosed only for a purpose consistent with this chapter
and as provided by department or investigating state agency rule and applicable
federal law.

 

Id. at § 48.101(b).

THE INVESTIGATION

            We are presented with an initial
report of self-neglect by hoarding and a later report of exploitation.  We must thus decide whether an APS specialist
may be compelled to produce files and offer testimony regarding the charges of
exploitation.  Subsection (e) requires
the executive commissioner to adopt rules that provide for the release, on
request, of otherwise confidential information in the deceased person’s record
to the personal representative appointed for the person’s estate.  Here that would be Ehrlich, the individual Devora
believed to be guilty of exploitation.  We
also look to subsection (d-1), which allows the department to relinquish
confidential information to a court that has a matter pending before it that
involves the person.  We then turn to
subsection (c-3), which requires the trial court to determine after hearing and
an in camera review whether disclosure
is essential to the administration of justice. 
Judge Gamboa found it was not.  

            Although Judge Gamboa was bothered
by the way Pauline received the information, we emphasize at the outset that
whether Devora breached confidentiality is not material to our decision.  Subchapter I of the Human Resources Code
contains enforcement procedures encompassing both administrative and judicial
review of employee misconduct.  We thus
reject Appellees’ argument that any information gleaned from Devora would be “fruit
of the poisonous tree.”  

Moreover,
as required by the Human Resources Code, the Department of Family Protective
Services has crafted rules related to the confidentiality and integrity of APS
case records.  An APS investigator should
investigate.  Investigation often
requires a discussion with collateral witnesses, called “collaterals” in the
APS handbook.  Indeed section 5112.12 of
the handbook specifies that the APS specialist “may provide collaterals,
including the reporter, with pertinent case information as needed in order to:  (1) obtain information necessary for the
investigation; or (2) arrange for services to address abuse, neglect, or
exploitation.”  Thus, the sole question
is whether disclosure of Devora’s file and her testimony is essential to the
administration of justice.

WHAT IS “ESSENTIAL TO
THE ADMINISTRATION OF JUSTICE”?

            During oral argument, the real
parties in interest focused heavily on the definition of “essential,” comparing
the term to “relevant” and arguing that “essential” required the evidence be
more than merely relevant.  We believe the
focus should first be on the phrase “administration of justice” and then what
is “essential” to that process.

            The Human Resources Code does not
define the administration of justice.  The
phrase has been bandied about frequently within our statutes, rules, and case
law but it is ill-defined.  We have
discovered the following analysis:

‘Administration of justice’ has been described
thusly:  ‘The administration of justice consists in the trial of cases in the court,
and their judicial determination and disposition by orderly procedure, under
rules of law, and putting of the judgment into effect.’ 

 

Howell v. State, 559 S.W.2d 432, 436 (Tex.Civ.App.--Tyler
1977, writ ref’d n.r.e.), citing  Massey v. City of Macon, 97 Ga.App. 790,
794, 104 S.E.2d 518, 521-22 (1958).  And the Texas Court of Criminal Appeals has
described the administration of justice as the “daily application of the law to
particular facts.”  Matchett v. State, 941 S.W.2d 922, 932 (Tex.Crim.App. 1996).  We adopt these definitions.

            “Essential”
encompasses the concepts of necessity, importance, indispensable, crucial, and
substantive.  Real parties in interest
contend, and Judge Gamboa agreed, that the information is available elsewhere
and in some instances would be cumulative. 
These arguments require a careful cross reference of the evidence which
already appears in the record.

            We
know from Brian Lee that Chesses complained Rabbi Greenberg was
pressuring him to sign documents that he did not want to sign.  Chesses described himself as a “captive
audience” because he could not get out of bed. 
Lee also described Chesses as a non-practicing Jew who did not attend
temple.

            From Herbert Ehrlich we know that Rabbi
Greenberg, who did not know Chesses until contacted by a friend, had made his
acquaintance at least by July 14, five days after he was admitted to ICU.  When the Rabbi called Ehrlich on July 14 to
discuss a person in ICU wanting a will, Ehrlich went immediately to the
hospital and expressed he felt “some urgency” to go right away.  We know that Rabbi Greenberg called Ehrlich
again on July 19 to tell him Chesses was doing better and Ehrlich headed right back
to ICU.  He spoke with the intensive care
physician and learned that Chesses was still not yet “ready.”  Ehrlich asked for the doctor’s telephone
number and called him the next day.  The
doctor told him Chesses’ mental capacity was improving but he was still
incapable.

Ehrlich waited two more days and when he heard Chesses had improved, he
was back at ICU by mid-morning and discussed with Chesses his estate.  On July 23, he was given the “green light” by
the medical staff.  He “wanted to get it
executed as soon as possible, because he was improving.”  One might infer that Ehrlich wanted to get
the will signed before the opportunity was lost.  Ehrlich testified that Chesses wanted Brian
Lee to be named as executor of the estate but that Lee declined.  Lee said he never talked to Ehrlich.  All of these discrepancies are available for
use at trial without reference to the APS specialist.  

Ehrlich attempted to videotape the execution of the will, the first time
he had ever done so.  The tape
inexplicably shut off before Ehrlich asked the big question:

Would you
reconsider giving your daughter more than $10,000 at this time?  Because I can cross out the amount and we can
execute the will.  Before I was able to
finish that question, he reared up and said, No, as I previously stated.  At that point, I believe that he understood
that he was writing his will.  He
understood his natural heir.  

 

Ehrlich denied
telling Pauline that her father was angry with her.  America Devora told Pauline a different
story.  

When
Pauline described how Ehrlich told her Chesses was mad at her, Devora responded
that she had been suspicious of Ehrlich. 
We know that a nurse named Mary Ann had made a similar statement.  But Devora went a step further.  Chesses told Devora that Rabbi Greenberg
pressured him to hire Herbert Ehrlich, and that both gentlemen pressured him to
sign a will that he did not want to sign. 
Chesses “wanted everything to go to you. 
He said he loved you.” Devora also refuted Ehrlich’s statements to
Pauline.  She couldn’t believe that
Ehrlich told Pauline that Chesses was angry. 
“He said that he loved you . . . he didn’t want to sign this will and he
-- he needed me to find you.”  This
he-said/she-said scenario is a battle of words. 
There is one person who can corroborate what really transpired.  Ehrlich tried to prove that Chesses was
estranged from his daughter and wanted to leave her as little as possible.  He videotaped the execution, even told his
assistant that “he had it on tape.”  But
of course, it is not on tape.  As
executor, Ehrlich has the authority to review the APS files.  Without court intervention, Pauline does not.

            We have reviewed the sealed
files.  Without detailing the specific
contents, we know Devora saw Chesses on the day he executed the will.  Her observations are recorded. Devora,
suspicious of the swirling attention around Chesses, was concerned about the
exploitation of her client.  Her attempts
to investigate an ongoing APS case were complicated by Ehrlich’s failure to
cooperate.  Her call to Pauline was part
of that investigation.  That this phone
conversation happened in the way that Pauline described it can only be
corroborated through Devora’s testimony and her investigative file.  Pauline’s testimony is inadmissible unless
her recitation of Devora’s statements is corroborated.  See Tex.R.Evid. 601(b).  

AVAILABILITY OF MANDAMUS REVIEW

            There are few cases addressing
the issue before us, five to be exact. 
We will examine each in turn in chronological order.

            In Coachman v. State, 692 S.W.2d 940 (Tex.App.--Houston [1st Dist.]
1985, pet. ref’d), the defendant was convicted of aggravated sexual assault of
a child.  On direct appeal, he challenged
the trial court’s refusal to permit his attorney to review the entire file from
Children’s Protective Services.  Coachman
contended that he was entitled to discover the name of the person who filed the
report and he was thus thwarted in his attempt to find potential
witnesses.  The trial court required the
prosecution to identify all of the State’s witnesses to be called at
trial.  The defense was also able to
elicit testimony revealing the name of the reporter.  Because Coachman made no showing of prejudice
or necessity, the appellate court concluded that the confidential nature of
child abuse reports should be maintained.

            In James v. State, 47 S.W.3d 710 (Tex.App.--Texarkana 2001, no pet.),
the defendant was charged with the aggravated sexual assault of his
daughter.  He complained on direct appeal
that the trial court erroneously excluded records of the Texas Department of
Protective and Regulatory Services which possibly contained evidence of prior
false accusations made by the victim. 
The trial court reviewed the documents in camera and denied James’ request for release of the
records.  The court of appeals found no
error because in reviewing the sealed file, it found no record that would have
been useful to the defense, nor did it show that any prior allegations were
determined to be false.  Id. at 712.

            In
re Fulgium, 150 S.W.3d 252 (Tex.App.--Texarkana 2004, no pet.)(orig.
proceeding) addressed the discoverability of confidential records in a suit
affecting the parent-child relationship. 
The Fulgiums sought mandamus relief to compel discovery of CASA records
and the depositions of the CASA case manager and the custodian of records of
the Texarkana Children’s Advocacy Center. 
CASA and the Advocacy Center sought protective orders, alleging that the
records were privileged under the Texas Family Code.  Tex.Fam.Code Ann. § 261.201
(West 2008).  The appellate court denied
mandamus relief because the Fulgiums failed to show that the information was
essential to the administration of justice or that the disclosure posed no
danger to child or another person.  Id. at 255.  In short, the grandparents had not
demonstrated that the trial court clearly abused its discretion.  

            In S.C.S. and K.J.S. v. Texas Department of Family and Protective Services,
2010 WL 2889664 (Tex.App.--Fort Worth 2010, no pet.), the appellants appealed
from the denial of their motions for disclosure of CPS records pursuant to the
Texas Public Information Act.  CPS
objected to releasing the information.  The
trial court conducted an in camera review
and found that disclosure was not essential to the administration of
justice.  The appellants claimed that
disclosure was essential to determine if civil or criminal actions should be
pursued against the person who filed false reports.  Reports of sexual abuse and negligent
supervision were made in both Texas and Oklahoma.  Both investigations were “ruled out.”  The appellate court, finding no case law or
statutory provision suggesting that dismissed or “ruled out” complaints of
child abuse are automatically deemed false and without merit, perceived no
abuse of discretion.  Id. at *2-3.

            Finally, in In re Agers, 2010 WL 1780133 (Tex.App.--Texarkana 2010, orig.
proceeding), a mother brought suit against a medical provider for negligence
causing severe brain injury to her son, Cole. 
The hospital sought the production of all records regarding the child
from the Department of Family and Protective Services.  Agers opposed production of the records because
they were confidential and irrelevant.  Following
an in camera review, the trial court
ordered production and Agers sought mandamus review.  The appellate court denied relief.

In light of the
parties’ relative positions, Cole’s condition, its cause(s), and any factors
contributing thereto go to the very heart of this case.  The Texas Supreme Court noted in Walker that a denial of discovery going
to the heart of a party’s case may render an appellate remedy inadequate.  827 S.W.2d at 843.  Having reviewed the briefs, the record, and
the DFPS records in dispute, we find that the trial court could have reasonably
determined that the disclosure of the DFPS records is relevant to Cole’s
condition, pre-natal and/or post-natal care, and that their disclosure was
essential to the administration of justice.

 

2010 WL 1780133 at *3.

 

            We end with the story of Don
Gray.  See Gray v. State, 55 Tex.Crim. 90, 114 S.W. 635 (Tex.Crim.App. 1908).  Gray shot and killed Will Phillips on January
12, 1907.  The men were close friends and
Phillips had been staying at Gray’s home. 
When Gray’s wife told him that Phillips had offered her a “gross and
serious insult,” an indecent proposal as it were, Gray drove into town and
confronted Phillips.  Several witnesses
observed the two engaged in conversation and Phillips had a knife in his hand
because he was whittling.  The men moved
out of sight and witnesses heard three shots fired in rapid succession.  The prosecutor and the victim’s family, who was
pursuing civil litigation, took the position that Gray shot Phillips in the
back.  Gray claimed that as the men
argued, Phillips started toward him with a knife and he fired in self-defense.  The State claimed that the bullet entered the
back and exited the breast.  Gray claimed
the bullet entered the breast and exited the back.  There was no autopsy performed and no
examination was conducted except as in the general course of preparing the body
for burial.

            Two trials in Llano County resulted
in hung juries and venue was moved to Burnet County.  Gray filed a motion to exhume the body so
that the precise nature of the wounds could be carefully examined.  The State objected that several witnesses had
observed the wounds, but admitted that there was no eyewitness to the firing of
the first shot or to the positions in which parties squared off.  The court noted,

It may be conceded
that there was a strong showing made by the state that all three of the shots
entered the body of the deceased from behind, and, yet, based not only on the
testimony of appellant but the testimony of other witnesses, this fact is
seriously disputed, and left, as we believe, in great doubt.

 

114 S.W. at 640.  The primary issue before the court was its
authority to order exhumation of Phillips’ body.  More than one hundred years have passed since
the court wrote these words, but they express better than any others the true
meaning of the “administration of justice”:

There may be no
authority directly supporting our conclusion, and indeed we have found none, but the conclusion at which we have arrived
seems to be within itself so just, so necessary to the administration of
justice, so valuable to society and the state, and so in keeping with the
principles of justice, that it must be correct. Such an examination would
have ascertained the truth, and this is the supreme end for which rules of
evidence were designed and towards which they should ever tend, so that we may
in all reverence say that we are ‘persuaded that neither death nor life’ shall
separate us from the ascertainment, when in the power of the court to do so, of
the very truth in every case. Magna est veritas et prevalebit.  (Truth is mighty and will prevail).  

 

Id. at 643.  [Emphasis and translation added.]




 

CONCLUSION

            Because the sealed files contain
information essential to the administration of justice, we conclude that the
trial court abused its discretion in refusing the discovery requests.  This is precisely the type of situation involving
manifest and urgent necessity.  Holloway v. Fifth Court of Appeals, 767
S.W.2d 680, 684 (Tex. 1989).  It is also
a situation that cannot be remedied by direct appeal.  Agers,
2010 WL 1780133 at *3.  We conditionally
grant the writ.  Mandamus will issue only
if Judge Gamboa fails to enter orders permitting discovery related to Devora
and the APS files, excluding the name and identity of the reporter.

 

 

May 30, 2012                                      ________________________________________________

ANN CRAWFORD
McCLURE, Chief Justice

 

Before McClure, C.J., Antcliff, J., and Chew, C.J. (Senior)

Chew, C.J. (Senior), sitting by assignment











[1]  The Code also provides that:  (d) The executive commissioner shall adopt
rules providing for the release, on request, to a person who is the subject of
a report of abuse, neglect, or exploitation or to that person’s legal
representative of otherwise confidential information relating to that report.  The department or investigating state agency
shall edit the information before release to protect the confidentiality of
information relating to the reporter’s identity and to protect any other
individual whose safety or welfare may be endangered by disclosure.

 

(d-1) Subject to Subsection (e-1), the executive
commissioner shall adopt rules providing for the release, on request, by the
department or investigating state agency of otherwise confidential information
relating to a person who is the subject of a report or investigation of abuse,
neglect, or exploitation or to whom the department has provided protective
services, to:

 

(1)
a court that has a matter pending before it that involves the person;

 

(2)
the attorney ad litem or any other legal representative, other than a guardian,
appointed for the person; and

 

(3)
the person’s legal guardian.

 

(e) The executive commissioner may adopt rules
relating to the release of information by the department or investigating state
agency that is contained in the record of a deceased individual who was the
subject of an investigation conducted by the department or investigating state
agency or to whom the department has provided protective services.  The rules must be consistent with the purposes
of this chapter and any applicable state or federal law.  The executive commissioner shall adopt rules,
subject to Subsection (e-1), that provide for the release, on request, of
otherwise confidential information in the deceased person’s record to the
personal representative appointed for the person’s estate.

 

(e-1) Information released by the department or an
investigating state agency under Subsection (d-1) or to a personal
representative under Subsection (e) may not include the identity of the person
who made the report of abuse, neglect, or exploitation.

 

(f) The department or investigating state agency may
establish procedures to exchange with another state agency or governmental
entity information that is necessary for the department, state agency, or
entity to properly execute its respective duties and responsibilities to
provide services to elderly or disabled persons under this chapter or other
law.  An exchange of information under
this subsection does not affect whether the information is subject to
disclosure under Chapter 552, Government Code.

 

(g) The department may establish procedures to
exchange with a community service provider or local governmental entity
confidential information relating to a report made under Section 48.051(a) that
is necessary for the department, provider, or entity to provide protective
services, health care services, housing services, or social services to the
person who is the subject of the report. An exchange of information under this
subsection does not affect whether the information is subject to disclosure
under Chapter 552, Government Code.

 

(g-1) The executive commissioner by rule shall
provide policies and procedures that are designed to guard against the
unauthorized release or dissemination of confidential information that is exchanged
under Subsection (g).